IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

CATHERINE E. WAIDE,                    )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )        Case No. CIV-16-817-D
                                       )
CITY OF OKLAHOMA CITY, *et al.*,       )
                                       )
            Defendants.                )

# **O R D E R**

Before the Court is Defendant City of Oklahoma City's Motion for Summary

Judgment [Doc. No. 54], filed pursuant to Fed. R. Civ. P. 56. The City seeks a judgment

in its favor on all claims asserted in the Complaint: gender and race discrimination, hostile

work environment, and retaliation under Title VII of the Civil Rights Act of 1964 as

amended ("Title VII"), 42 U.S.C. § 2000e *et seq*.; interference with rights under the Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.; violation of a Fourteenth

Amendment right of due process under 42 U.S.C. § 1983; and a parallel discrimination

claim under Oklahoma law.[1] Plaintiff Catherine Waide has filed a response brief [Doc.

No. 75], and the City has replied [Doc. No. 78]. Thus, the Motion is fully briefed.[2]

---

[1] All other claims originally asserted against the City have been voluntarily dismissed.
See 8/2/17 Order [Doc. No. 43] (granting Plaintiff's Consent Motion to Amend Complaint;
dismissing Counts III and VI and allegations under 42 U.S.C. § 1985).

[2] In addition to this full round of briefing, the City supplemented its original brief with an
amended exhibit [Doc. No. 85] of additional deposition testimony. Also, Defendant Douglas
Kupper filed a motion for summary judgment regarding Plaintiff's § 1983 claim. In their present
briefs, the City adopts the facts and arguments in Defendant Kupper's motion, and Plaintiff adopts
her response to that motion. The Court granted Defendant Kupper's motion by Order of March 4,

## Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex*, 477 U.S. at 322-23. If the movant carries this burden, the nonmovant must go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see* Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

_____

2019 [Doc. No. 86]. For the same reasons stated in the March 4 Order, the City is entitled to summary judgment on Plaintiff's § 1983 claim, and therefore, this part of the City's Motion will be granted without further discussion.

The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-52.

## Statement of Undisputed Facts[3]

Until June 22, 2015, Plaintiff worked for the City as the superintendent of the grounds division of the parks department. This is a high-level management position that reports directly to the assistant director of the department, who in turn reports directly to the director. In her position as a division head, Plaintiff (a white female) had five peers who were heads of other divisions – three white males, one black male, and another white female. Plaintiff directly supervised two unit operations supervisors (a black male and a white male), a management specialist (white female), and an office coordinator (black female). As discussed *infra*, Plaintiff complains as part of her Title VII claim that the black male under her supervision, John Brooks, received no discipline for engaging in some of the same conduct for which she was terminated.[4]

During 2014, the director and assistant director of the parks department, as well as the business manager, all retired. In May 2014, Douglas Kupper was hired as the new

---

[3] This statement includes material facts that are properly supported by the asserting party and not opposed in the manner required by Rule 56(c). Any stated fact that is not supported by a party's citation to the record is disregarded. In assessing the affidavits submitted, the Court will "disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form." *Argo v. Blue Cross & Blue Shield of Kans., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (emphasis omitted).

[4] Plaintiff points out that she was not Mr. Brooks' supervisor after April 2, 2015, when she was relieved of certain duties; Mr. Brooks then was directly supervised by the assistant director. But Plaintiff does not identify any alleged misconduct by Mr. Brooks during that time period.

director.  In October 2014, Walt Bratton was hired as the assistant director and became Plaintiff's immediate supervisor.  In November 2014, Mr. Bratton approved Plaintiff's request to take 40 hours of paid leave from December 15-19, 2014; the parties dispute whether Mr. Bratton knew this leave period was protected by FMLA.

On November 14, 2014, Mr. Bratton presented Plaintiff with her annual performance evaluation for the period of June 2013 to June 2014.  Plaintiff received an overall rating of "Proficient – Meets All Expectations."  During the meeting, Mr. Bratton set goals for Plaintiff.  She later provided comments about the goals; Mr. Bratton responded and sent a copy to Mr. Kupper.  On November 20, 2014, Plaintiff met with Mr. Kupper and delivered a document stating complaints about Mr. Bratton's supervision, particularly his evaluation and his responses to her comments.  Plaintiff said she did not believe any further conversation between her and Mr. Bratton would be successful because "he appears to interpret a differing opinion as a personal attack."  *See* Def. Kupper's Mot., Ex. 4 [Doc. No. 48-4] at 1 (ECF page numbering).  Plaintiff stated that Mr. Bratton had questioned her integrity and abilities as a manager, and she complained of his chastising tone and lack of professional courtesy.  Plaintiff also suggested certain comments by Mr. Bratton were "harassing."  *Id*. at 3.  Mr. Kupper sent Plaintiff's complaint to the human resources department ("HR") and discussed it with Mr. Bratton.

More conflict between Plaintiff and Mr. Bratton, and complaints to Mr. Kupper, ensued.  On December 22, 2014, following her FMLA leave, Plaintiff complained that Mr. Bratton's had "harassed" her female subordinate during her absence about Plaintiff's

FMLA leave.  *See* Waide Aff. [Doc. No. 75-1] ¶ 9.  Mr. Kupper viewed Mr. Bratton's questioning of Plaintiff's leave as inappropriate and discussed it with him.

On December 23, 2014, Mr. Bratton met with Plaintiff and discussed the status of five job assignments.  Later that day, he followed up with an email summarizing their agreement regarding her projects and deadlines.  He also advised her to "concentrate on focusing [her] energy on listening and following through with work assignments . . . rather than spending [her] valuable energy on how to get out of them."  *See* City's Mot., Ex. 8 [Doc. No. 54-8].  Plaintiff was offended by this comment, and complained to Mr. Kupper about it on December 29, 2014.  She viewed it as an example of how Mr. Bratton "continue[d] to chastise, belittle and berate" her; she told Mr. Kupper that she found "the continual nature of this type of communication harassing."  *See id.*  After receiving this message, Mr. Kupper again contacted HR regarding Plaintiff's complaint.

In January 2015, Plaintiff, Mr. Brooks, and Mr. Bratton interviewed candidates for a vacant position of field operations supervisor ("FOS") in the grounds division.  They selected two candidates and recommended them to the personnel department for hiring. The personnel operations manager, Rebecka Shaw, rejected the recommendation in favor of a different candidate, David Thiemann, whom they were instructed to hire.  Plaintiff, Mr. Brooks, and Mr. Bratton met with Ms. Shaw on January 23, 2015, concerning her instructions.  She directed them to meet with Mr. Thiemann, explain their expectations, delineate what tasks he would perform, and let him decide whether to accept the challenge. In Ms. Shaw's words, they should "have a come to Jesus meeting [with Mr. Thiemann] so he understands what he's getting into."  *See* Shaw Dep. [Doc. No. 75-16], 29:22-30:6.

Plaintiff and Mr. Brooks subsequently met with Mr. Thiemann and offered him the job, which he accepted. Plaintiff's statements during the meeting later became the subject of a complaint by Mr. Thiemann in March 2015. He accused Plaintiff and Mr. Brooks of trying to discourage him from taking the job and setting him up to fail. According to Plaintiff, her statements were misconstrued and taken out of context. Within two months after assuming the position, Mr. Thiemann asked to be demoted to a lower position.

Near the time of Mr. Thiemann's promotion, another vacant FOS position was filled by a candidate selected by Mr. Brooks and Plaintiff, without consulting Mr. Bratton. On January 29, 2015, Mr. Bratton sent email messages to Plaintiff and Mr. Brooks requesting an explanation. In communicating with Mr. Brooks, Mr. Bratton sent a copy to Plaintiff and included a message to her ("Catherine it is now 5:25 PM, and once again I sent you an email(s) requesting information and you didn't respond") and referenced the personnel policy regarding insubordination. *See* City's Mot., Ex. 10 [Doc. No. 54-10]. On January 30, 2015, Plaintiff forwarded Mr. Bratton's message to Mr. Kupper with a complaint that she felt threatened and disrespected.[5] She also apologized for her mistake regarding the second FOS selection, stating she understood "the selection process was inappropriate and lacking communication." *Id*. Ex. 11 [Doc. No. 54-11].

On February 16, 2015, Mr. Bratton met with Plaintiff and presented her with a "Documentation Log" listing dates and items of concern regarding her performance. A personnel specialist, Carla Chatman, attended the meeting. Mr. Bratton discussed with

---

[5] She also explained that she did not respond to Mr. Bratton's email because she believed an oral discussion had satisfied his concern.

Plaintiff the contents of the log, which consisted of a four-page, single-spaced document spanning a period from October 7, 2014, to February 13, 2015. The log included alleged instances in which Plaintiff failed to communicate with Mr. Bratton, did not comply with his directives or deadlines, and acted in an unprofessional manner, including making degrading comments regarding her employees. More than one witness has testified that Plaintiff used the word "retards" in reference to part-time or seasonal employees who worked in grounds maintenance. Plaintiff denies these reports and the accuracy of Mr. Bratton's log; she later provided a written response. Plaintiff cites the log as another example of Mr. Bratton's harassment and attempts to intimidate her.

On February 20, 2015, Plaintiff met with Ms. Chatman and the personnel director, Dianna Berry, to discuss Mr. Bratton's treatment of her. Plaintiff took a copy of the log to the meeting. According to Plaintiff, she reported that she viewed Mr. Bratton's conduct as harassment and she believed he was treating her more harshly than male employees under his supervision. Neither Ms. Chatman nor Ms. Berry perceived Plaintiff's complaint as raising a personnel issue to be investigated. Plaintiff was instructed to discuss her concerns with Mr. Kupper. However, Mr. Kupper later met with Ms. Berry and others to discuss complaints that the personnel department had received about Mr. Bratton.

On March 17, 2015, a probationary employee in the grounds division, referred to in Plaintiff's Motion only as D.B., allegedly made remarks that his co-workers considered threatening while holding a machete. D.B.'s supervisor did not send him home at the time of the incident, but reported it to Mr. Brooks. Plaintiff and Mr. Brooks reviewed witness statements and interviewed D.B., who denied picking up a machete. D.B. also complained

that he had been denied training and had been retaliated against by his supervisor. Plaintiff and Mr. Brooks decided to transfer D.B. to another district until an investigation could be completed. However, on March 27, 2015, Mr. Bratton directed Plaintiff to terminate D.B.'s employment, which she did.

Also in March 2015, Mr. Kupper directed Mr. Bratton to meet with Ms. Shaw and investigate a complaint that HR had received from Mr. Thiemann about his treatment by Mr. Brooks. Mr. Bratton launched an investigation in which he interviewed a number of employees regarding their treatment by Mr. Brooks and Plaintiff. On March 31, 2015, Mr. Bratton delivered a written report to Mr. Kupper that summarized witness interviews, stated his findings, and recommended that Plaintiff and Mr. Brooks "should be relieved of the responsibilities of their positions" due to "a pattern of behavior of management through fear and intimidation." *See* City's Mot., Ex. 20 [Doc. No. 54-20] at 13.

During a meeting with Mr. Kupper and Mr. Bratton on April 2, 2015, Plaintiff and Mr. Brooks were informed of the results of the investigation, and Plaintiff was informed she would be relieved of supervisory duties. Mr. Brooks received no discipline because, according to Mr. Kupper, "[t]he actions that Brooks was accused of happened under [Plaintiff's] management, not Mr. Bratton's management." *See* Kupper Dep. 185:16-20. Mr. Kupper intended for Mr. Bratton to start "immediately working with Mr. Brooks . . . to change his attitude towards his employees, and take the necessary opportunities to counsel [him] on a better way of communicating." *Id*. 186:2-7. Asked why Plaintiff did not receive the same opportunity, Mr. Kupper explained, "I felt that a woman and a manager of so many years of experience should intuitively know that these are the wrong

activities, and again, if she wasn't aware that her management team was acting inappropriately, then there was issues with her ability to manage the organization." *Id*. 186:8-15.

Mr. Kupper provided Plaintiff a written list of her changed job responsibilities in a memorandum dated April 2, 2015. *See* City's Mot., Ex. 21 [Doc. No. 54-21]. Mr. Kupper intended the job changes to limit Plaintiff's contact with subordinate employees. Plaintiff believed some of the changes – such as a requirement to "[c]heck in with Walt Bratton each morning when arriving at the office," *id*., ¶ 3 – were intended to humiliate her. She also viewed the investigation as retaliation for her complaints about Mr. Bratton's conduct.

At the April 2 meeting, Plaintiff delivered her written rebuttal to Mr. Bratton's log, and Mr. Kupper reviewed it. In the rebuttal, Plaintiff complained of Mr. Bratton's "oppressive micromanagement" that was meant to harass her and accused Mr. Bratton of engaging in "workplace bullying." *See* City's Mot., Ex. 22 [Doc. No. 54-22] at 6, 10. Plaintiff also provided a copy of the rebuttal to HR, and met with Ms. Chatman on April 7, 2015, to discuss it and Mr. Kupper's April 2 memo. Plaintiff performed the responsibilities set out in the April 2 memo with agreed modifications, and certain duties that had been removed were subsequently restored.

Later in April 2015, in response to complaints to HR about Mr. Bratton, Ms. Berry interviewed other division heads regarding Mr. Bratton's supervision. One interviewee, Melinda McMillan, also criticized Plaintiff's supervision of subordinate employees. Ms. Berry prepared a summary of reported complaints about Mr. Bratton. *See* Pl.'s Resp. City's Mot., Ex. 9 [Doc. No. 75-9]. In late April or early May, Mr. Kupper determined

that Mr. Bratton was not correcting the issues that they had discussed, and he informed Mr. Bratton that he needed to resign.  Mr. Bratton resigned May 4, 2015, and Mr. Kupper selected Ms. McMillan to replace him.

Mr. Kupper and Ms. McMillan met with Plaintiff and her subordinates on May 5, 2015, to inform them of these changes.  It was later reported to Mr. Kupper that Plaintiff was seen celebrating Mr. Bratton's departure by singing and dancing to the song "Happy" by Pharrell Williams in front of employees.  Mr. Kupper received no first-hand account of the incident, and Plaintiff denies that it occurred.  Mr. Kupper has testified that he believed Plaintiff's reported behavior, combined with prior attitude and management issues, warranted disciplinary action.  Plaintiff denies this is the real reason for her discipline.

On May 22, 2015, Plaintiff was placed on administrative leave with pay and given written notice by Mr. Kupper of a pre-determination meeting regarding disciplinary action, "up to and including termination."  *See* Def. Kupper's Mot., Ex. 5 [Doc. No. 48-5] at 2.  The notice alleged three policy violations and provided examples of unacceptable conduct:  fostering a culture of intimidation (describing two specific instances of intimidating statements, including ones to Mr. Thiemann); poor decision making or management of human resources (citing the decision to retain and transfer D.B.); and unprofessionalism, describing two instances of unprofessional conduct (the "Happy" incident after Mr. Bratton resigned and derogatory references to employees as "retarded").

On June 5, 2015, the pre-determination meeting was held, and Plaintiff provided a written response to the allegations in the notice.  On June 22, 2015, Plaintiff's employment was terminated by Defendant Kupper.  Plaintiff received a written decision, stating that she

was terminated because she "failed to meet the department's expectations of a division manager" and the administration lacked confidence in her ability to lead her division "in a manner consistent with the goals and vision of the administration." *See* Def. Kupper's Mot., Ex. 7 [Doc. No. 48-7] at 2.

Plaintiff filed a grievance challenging her termination as provided by the City's personnel policies. In her grievance statement, Plaintiff denied the allegations against her, complained that progressive discipline was not used, and alleged that her discipline was retaliatory (for complaining about Mr. Bratton) and discriminatory (because male employees involved in some incidents were not disciplined). A grievance review board issued a decision that was largely favorable to Plaintiff and recommended her reinstatement. See Pl.'s Resp. City's Mot., Ex. 54 [Doc. No. 57-56]. However, the city manager rejected the board's recommendation and upheld Plaintiff's termination. The city manager stated that Plaintiff was "terminated for conduct that [he found] unacceptable for a Division Manager" and that he "believe[d] it to be in the best interest of the City . . . that [she] not be reinstated." *See* Def. Kupper's Mot., Ex. 9 [Doc. No. 48-9]. Plaintiff also filed an EEOC charge of gender and race discrimination and retaliation. After Plaintiff received an EEOC notice of her right to sue, she commenced this action in state court in June 2016, and Defendants timely removed it to federal court.

## Defendant's Motion

The City seeks summary judgment on Plaintiff's Title VII claims under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The City first asserts that Plaintiff cannot establish a *prima facie* case of race discrimination

because she is a member of a historically favored group and she cannot establish circumstances from which to infer reverse race discrimination by the City. The City also asserts that Plaintiff cannot establish a *prima facie* case of gender discrimination because she lacks any facts to show that she was disciplined under circumstances suggesting disparate treatment from a similarly situated male employee. The City also asserts that Plaintiff cannot establish a *prima facie* case of retaliation because she cannot show either that she engaged in protected opposition to discrimination or that there is a causal connection between any such activity and an adverse action by the City. Further, if Plaintiff could establish a *prima face* case under Title VII, the City asserts that it had legitimate, nondiscriminatory and nonretaliatory reasons for terminating Plaintiff and she cannot show these reasons are pretextual. Finally, the City asserts that Plaintiff cannot establish the existence of a gender-based hostile work environment (as alleged) or show that the City took an adverse action that interfered with Plaintiff's right to take FMLA leave.

## Plaintiff's Response

In response, Plaintiff strongly disagrees with the City's view of her Title VII claims except she does not address race discrimination; her response is also silent regarding her FMLA claim. Although the City contends these omissions mean "Plaintiff has confessed its Motion" regarding her claims of race discrimination and FMLA interference, this is not quite true. Under Rule 56(e)(3), the Court has an independent duty to determine that summary judgment is appropriate, even in the absence of a response by the adverse party. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002); *Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir. 2002). Thus, the Court must still consider

whether the City is entitled to summary judgment on Plaintiff's race discrimination and FMLA claims. After addressing these claims, the Court will turn to the contested claims addressed by the City's Motion.

## Discussion

### A.      Reverse Race Discrimination

Under the traditional *McDonnell Douglas* analysis, the first element of a *prima facie* case requires proof that the plaintiff is a member of a protected class. In *Notari v. Denver Water Department*, 971 F.2d 585 (10th Cir. 1992), the court of appeals "held that in cases of reverse racial discrimination, instead of showing minority group membership, a plaintiff must 'establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.'" *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003) (quoting *Notari*, 971 F.2d at 589). In modifying the first element of a *prima facie* case, the Tenth Circuit "recognized that members of the majority group are not necessarily entitled to a presumption of discrimination afforded to members of a minority group." *Id.*; *see Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997). In this case, Plaintiff makes no effort to show circumstances that would suggest the City is an unusual employer who discriminates against white employees.[6] Therefore, Plaintiff has failed to establish a *prima facie* case of reverse race discrimination, and the City is entitled to summary judgment on this claim.

---

[6]    Plaintiff also does not provide any direct evidence of racial discrimination in the City's decision to terminate her employment.

B.     **FMLA Interference**

An FMLA claim based on an entitlement or interference theory arises from 29 U.S.C. § 2615(a)(1). *See Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1131 (10th Cir. 2014); *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1170 (10th Cir. 2006)). The Tenth Circuit has explained liability under this theory as follows:

> To establish a claim of FMLA interference under § 2615(a)(1), an employee must show "(1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights." *Campbell* [*v. Gambro Healthcare, Inc.*], 478 F.3d [1282] at 1287 [(10th Cir. 2007)] (internal quotation marks and brackets omitted). To satisfy the second element of an interference claim – adverse action interfering with the right to take FMLA leave – "the employee must show that she was prevented from taking the full 12 weeks[] of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Id.* Thus, an interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leave or while the employee is still on FMLA leave. *Id.*

*Dalpiaz*, 760 F.3d at 1132 (footnote omitted). "The interference or entitlement theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).

It is undisputed that Plaintiff was entitled to FMLA leave, that she submitted a request to take one week of FMLA leave in December 2014 to care for a family member, and that she was approved to take paid leave that week. Plaintiff does not present any facts to show that the City took an adverse action against her in December 2014 that prevented

14

her from taking the leave or that prevented her from returning to work after the leave. Therefore, she has failed to establish an essential element of her alleged FMLA claim, and the City is entitled to summary judgment on this claim.

## C.     Hostile Work Environment

A hostile work environment that violates Title VII is one involving harassment based on a prohibited factor, such as gender, that is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "Severity and pervasiveness are evaluated according to the totality of circumstances, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). "[T]he environment must be both subjectively and objectively hostile or abusive." *MacKenzie v. City of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). The fact-finder must "judge the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Harris*, 510 U.S. at 21. "But severity and pervasiveness are not enough. The 'plaintiff must produce evidence that she was the object of harassment *because of her gender*.'" *Chavez*, 397 F.3d at 833 (quoting *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998); emphasis added in *Chavez*). If

these elements are established, a plaintiff must also establish a basis for holding the employer liable, such as proof that the employer "knew or should have known of the conduct and failed to stop it." *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1988); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012).

In this case, the City acknowledges Plaintiff's view that she was "harassed" or treated harshly by Mr. Bratton, but it challenges Plaintiff's ability to prove objectively severe or pervasive conduct based on gender. The City also points to facts that show it responded to complaints by Plaintiff and others about Mr. Bratton's management style by counseling Mr. Bratton and then causing him to resign. Based on these facts, the City contends it "took prompt remedial action" that absolves it of any liability for Mr. Bratton's conduct. *See* City's Mot. at 26.

In response, Plaintiff presents facts and evidence that show, when viewed most favorably to her as required by Rule 56, that Mr. Batton engaged in a course of conduct toward Plaintiff in which he closely supervised her work, frequently assigned her tasks and deadlines, repeatedly criticized her performance and her response (or lack thereof) to his instructions, and arguably belittled or demeaned her as a management-level employee. The evidence also shows Mr. Kupper adopted Mr. Bratton's recommendation to limit Plaintiff's responsibilities and imposed requirements that she found demeaning. However, Plaintiff has not presented any evidence of sexual or gender-based conduct, any physical threats or overtly hostile conduct, any insults or use of derogatory language, or any facially discriminatory conduct. The Court recognizes that gender-neutral conduct may in fact be gender-based and a hostile work environment may be created when gender-neutral

harassment is viewed in the context of other gender-discriminatory conduct and hostility. *See Chavez*, 397 F.3d at 833, 836-37; *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097, 1102 (10th Cir. 1999). The Court finds, however, that Plaintiff has not pointed to circumstances that, viewed objectively, establish severe or pervasive harassment that created a hostile or abusive working environment based on gender.

In short, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of material fact as to whether she was subjected to a hostile work environment from gender-based harassment. Therefore, the Court finds that the City is entitled to summary judgment on Plaintiff's hostile work environment claim.

## D.     Gender Discrimination

### 1.     *Prima Facie* Case

To establish a *prima facie* case of gender discrimination under the *McDonnell Douglas* framework, a plaintiff must establish that 1) she is a member of a protected class; 2) she suffered an adverse employment action; and 3) "the challenged action took place under circumstances giving rise to an inference of discrimination." EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007). An inference of discrimination may be shown by circumstantial evidence, for example, by showing that a similarly situated male employee was treated more favorably than the female plaintiff. *See Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1231-32 (10th Cir. 2009). In this case, the City does not dispute that Plaintiff can satisfy the first two elements; it challenges only Plaintiff's ability to satisfy the third prong. The City asserts that Plaintiff relies only on the fact that

she was treated differently from Mr. Brooks but he was not similarly situated to Plaintiff because he was a subordinate employee.

The Court is not persuaded that differences in the management-level positions of Plaintiff and Mr. Brooks are dispositive. Mr. Kupper was specifically asked to explain his different treatment of Plaintiff and Mr. Brooks when Mr. Bratton recommended that both of them should be disciplined and relieved of their supervisory duties. Mr. Kupper's testimony in response to this question could reasonably be found to suggest that he based his decision, in part, on Plaintiff's gender. Mr. Kupper stated that as an experienced manager and <u>as a woman</u> Plaintiff should have intuitively known that her behavior was improper. Based on this direct reference to gender as a basis for Mr. Kupper's discipline of Plaintiff, the Court finds that a reasonable inference of gender-based decision making by Mr. Kupper with respect to Plaintiff's termination could also be drawn. Therefore, the Court finds that Plaintiff has demonstrated a genuine dispute of material fact as to her *prima facie* case of gender discrimination.

### 2.     Pretext

Proceeding to the next step of the *McDonnell Douglas* analysis, the City asserts that it had legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, as shown by Mr. Kupper's pre-termination notice and written termination decision. Plaintiff responds by presenting facts and argument to show these asserted reasons for terminating her employment are pretextual.

"A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or

contradictory that a rational factfinder could conclude they are unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038-39 (10th Cir. 2011) (internal quotations and alterations omitted); *see Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1194 (10th Cir. 2016). Also, "[e]vidence of pretext may include prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities . . . ; and the use of subjective criteria." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (internal quotation omitted). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc*., 478 F.3d 1160, 1166 (10th Cir. 2007) (internal quotation omitted).

Upon consideration of the record presented, the Court finds that Plaintiff has presented sufficient facts and evidence, although barely, from which a reasonable finding of pretext could be made. Plaintiff primarily argues that the allegations of misconduct leveled against her were unfounded, and she complains of discriminatory conduct by Mr. Bratton, who was not involved in the decision to terminate her employment. However, the record also contains evidence, discussed *supra*, suggesting that Mr. Kupper held Plaintiff to a higher standard because she was a woman. His stated reasons for terminating her employment are entirely subjective. Plaintiff also argues facts that, viewed most favorably to her, suggest other weaknesses in the explanation of why Plaintiff's alleged misconduct warranted immediate termination. Accordingly, regardless whether the Court would draw the same inferences, the Court finds that Plaintiff has made a minimally

sufficient showing to establish a genuine dispute of material fact regarding whether the City's stated reasons for terminating her employment are pretextual.

For these reasons, the City is not entitled to summary judgment on Plaintiff's gender discrimination claim.

## E.     Retaliation

The same burden-shifting framework of *McDonnell Douglas* guides the analysis of Plaintiff's retaliation claim.  *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008).  Following *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), the initial *prima facie* case of retaliation is formulated as follows:

> To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.

*Argo v. Blue Cross & Blue Shield of Kans., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (footnote omitted); *accord Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007).  Once a plaintiff makes this initial showing, "[i]f the defendant is able to articulate a legitimate nondiscriminatory reason for the adverse action, the plaintiff must then show that the articulated reasons are a pretext for retaliation."  *Medlock*, 164 F.3d at 550.  In this case, the City challenges both Plaintiff's ability to establish the first and third elements of her *prima facie* case and her ability to prove pretext.

First, as to protected activity, the City contends Plaintiff's many complaints about Mr. Bratton did not allege gender discrimination and, thus, they were not protected by Title VII.  The City relies on the rationale of *Petersen v. Utah Dep't of Corr.*, 301 F.3d

1182, 1888 (10th Cir. 2002), that "an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII."

Plaintiff responds, correctly, that no "magic words" are necessary. "[T]o qualify as protected opposition [to discrimination] the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Further, a complaint is protected even if the employee is wrong about whether the conduct of which she complains constitutes a violation of Title VII. It is "enough if she had a 'good faith belief that Title VII ha[d] been violated.'" *Petersen*, 301 F.3d at 1188 (quoting *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)). Title VII permits a plaintiff to maintain a retaliation claim "based on a reasonable good-faith belief that the underlying conduct violated Title VII." *See Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171-72 (10th Cir. 2003).

Upon consideration of the facts presented by Plaintiff, and drawing all reasonable inferences in her favor, the Court finds that Plaintiff has demonstrated a genuine dispute of material fact as to whether she engaged in protected opposition to discrimination based on a reasonable belief that Title VII had been violated. Clearly, by the time her rebuttal to Mr. Bratton's log was presented, Plaintiff was complaining of harassment and a hostile work environment; she cited and quoted from EEOC materials and the City's personnel policy regarding harassment. *See* City's Mot., Ex. 22 [Doc. No. 54-22] at 9-10. Although it is less clear that Plaintiff identified the harassment as gender-based, Plaintiff believed she was being treated more harshly than her male counterparts and she informed Ms. Berry

of this belief. Ms. Berry's report of the investigation into complaints against Mr. Bratton identified "potential gender discrimination issues" as one concern. *See* Pl.'s Resp. City's Mot., Ex. 9 [Doc. No. 75-9] at 1. Thus, the Court finds that Plaintiff may be able to establish protected activity and the first element of a *prima facie* case of retaliation.

As to the third element, a causal connection between Plaintiff's protected activity and an adverse employment action, the court of appeals has explained as follows:

> "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quotation omitted). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. Otherwise, "the plaintiff must offer additional evidence to establish causation." *Id.*

*Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006); *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). For this purpose, "a one and one-half month period between protected activity and adverse action may, by itself, establish causation," [but] "a three-month period, standing alone, is insufficient to establish causation." *Anderson*, 181 F.3d at 1179. Further, a plaintiff must show the decisionmaker in the adverse action knew of the employee's protected activity. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007); *see also Hinds*, 523 F.3d at 1203.

Plaintiff relies solely on a close temporal proximity to establish a causal connection between her complaint of gender-based harassment by Mr. Bratton and her termination. *See* Pl.'s Resp. City's Mot. at 21. Plaintiff presented her rebuttal memo and discussed it with HR on April 7, 2015. Plaintiff was placed on administrative leave on May 22, 2015; the meeting regarding possible discipline of Plaintiff was held June 5, 2015; and the

termination decision was made June 22, 2015. Thus, the adverse action that forms the basis of Plaintiff's retaliation claim is separated from her protected activity by less than three months.[7] Under similar circumstances, the court of appeals has been willing to assume that a causal connection could be found. *See Anderson*, 181 F.3d at 1179 ("assuming two months and one week is sufficient to support a prima facie case of retaliation"); *see also Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 735 (10th Cir. 2006) (same). Further, Plaintiff's termination was closely connected to Mr. Bratton's resignation, which was partially based on her complaints.

Therefore, on the summary judgment record presented, the Court finds that Plaintiff has carried her burden to demonstrate that a genuine dispute of material facts precludes summary judgment on the basis urged by the City, that is, she is unable to establish a *prima facie* case of retaliation. Further, as discussed above, the Court also finds a genuine dispute of material fact regarding pretext. Therefore, the City is not entitled to summary judgment on Plaintiff's claim of retaliation.

## Conclusion

For these reasons, the Court finds that the City is entitled to summary judgment on Plaintiff's claims of race discrimination and hostile work environment and Plaintiff's FMLA and § 1983 claims, but that genuine disputes of material facts preclude summary judgment on Plaintiff's claims of gender discrimination and retaliation.

---

[7] Plaintiff also presents facts to show she was assigned a "not eligible for rehire" status sometime after her termination, and she seems to suggest in her argument that this designation might constitute a material adverse action. *See id.* at 22. However, she does not identify when the designation occurred, and she does not connect it to a protected activity.

IT IS THEREFORE ORDERED that Defendant City of Oklahoma City's Motion for Summary Judgment [Doc. No. 54] is GRANTED in part and DENIED in part, as set forth herein.

IT IS SO ORDERED this 29th day of March, 2019.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE